**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  13-23620-CIV-ALTONAGA/Simonton**

**ROD EISENBERG**, *et al.*,

      Plaintiffs,

vs.

**CITY OF MIAMI BEACH**,

      Defendant.

_____/

**ORDER**

**THIS CAUSE** came before the Court for oral argument on January 22, 2014 on Defendant, City of Miami Beach's (the "City['s]") Motion to Dismiss or Strike Plaintiffs' Complaint ("Motion") [ECF No. 16], filed November 22, 2013.  The undersigned has carefully considered the parties' written submissions, the record, oral arguments, and applicable law.

**I. BACKGROUND**[1]

This case involves various claims in connection with the Sadigo Court Apartment Hotel (the "Sadigo") located at 334 20th Street in Miami Beach, Florida.  (*See* Compl. ¶ 1).  Eisenberg is the president of Eisenberg Development, doing business as the Sadigo.  (*See id.* ¶¶ 1–2).  Eisenberg Development is a Florida corporation, with its principal place of business in Miami Beach, Florida.  (*See id.* ¶ 1).  The City is a Florida municipal corporation.  (*See id.* ¶ 3).

Eisenberg Development purchased the Sadigo in 1988 and continues to own and operate it.  (*See id.* ¶¶ 6, 9).  Built in 1936, the Sadigo is a "contributing historic structure" in the City's Museum Historic District.  (*Id.* ¶ 6).

---

[1] The facts, taken from the Complaint [ECF No. 1], are presented in the light most favorable to Plaintiffs and are accepted as true.

**A.  Relationship Between Eisenberg and the City**

In 1993, Eisenberg discovered the City's bid selection process was corrupt.  (*See id.* ¶ 10).  The City requested bid proposals to lease space in the Old City Hall.  (*See id.*)  The City rejected Eisenberg and the Miami Design Preservation League's joint bid without any consideration, selecting a competing bid instead.  (*See id.*).  Eisenberg sued the City to reopen the bid process.  (*See id.* ¶ 11).  Through discovery, Eisenberg learned the winning bidder was receiving free rent in the Old City Hall during the bid challenge.  (*See id.*).  Eisenberg also discovered a City commissioner and his son had "received what amounted to an illegal brokerage commission on a $10 million real estate transaction."  (*Id.*).

Eisenberg subsequently disclosed these instances of City corruption to the media.  (*See id.*).  "As a result of [] Eisenberg's disclosures, a scandal ensued which ultimately led to the City manager resigning, and the City attorney being forced out . . . . [T]he Florida Department of Business and Professional Licensing subsequently brought an eleven-count administrative complaint against the City commissioner's son, [the] son's company, and the winning bidder . . . , alleging kickbacks and illegal profits on the real estate transaction."  (*Id.* ¶ 12).  The winning bidder agreed to pay fines.  (*See id.*).

In 1995, Eisenberg challenged the City and Miami-Dade County's creation of a redevelopment area related to the Miami Beach Convention Center.  (*See id.* ¶ 11).  City officials claimed Eisenberg was taking revenge after losing his earlier lawsuits challenging the bid selection process.  (*See id.*).  Plaintiffs do not allege any intervening events between 1995 and 2004.

Between 2004 and 2009, Plaintiffs and others in the neighborhood voiced many complaints about the health and safety risks and Code compliance violations of an abandoned

hotel in the neighborhood. (*See id.* ¶ 20). The City investigated some of these complaints but did not resolve the problems with the building. (*See id.*). In 2009, Eisenberg urged the City's Zoning Board of Adjustment to handle the Code violations more quickly and deny the building owner's request for a one-year extension to comply with the Code. (*See id.*). The Zoning Board ultimately required the owner to board the building and remove loose debris before granting the extension. (*See id.*). In light of this, Eisenberg withdrew his objection, and the Zoning Board later approved the extension. (*See id.*).

Between 2006 and 2012, multiple City officials were investigated and prosecuted for corruption. In 2006, a City electrical inspector was arrested for soliciting bribes (*see id.* ¶ 14); in 2008, a City fire protection analyst was fired after reporting suspicions of kickbacks (*see id.* ¶ 15); also in 2008, a City planner, examiner, and inspector were all caught accepting bribes (*see id.* ¶ 16); in 2012, City procurement director, Gus Lopez, was charged with sixty-three felony counts, including racketeering, bid-tampering, and illegal compensation (*see id.* ¶ 17); and also in 2012, seven City Code compliance and fire department inspectors, including the City's lead code compliance officer, Jose Alberto ("Alberto"), were arrested for extortion and accepting bribes in June 2011 to bypass City Code enforcement inspections and fines (*see id.* ¶¶ 18–19).

**B. The Sadigo**

The Sadigo originally opened in 1936 as an apartment with transient rentals, and it has continued operating in this fashion without objection from the City. (*See id.* ¶ 22). The Sadigo is located in an RM-2 zoning district, where the "'main permitted uses' include apartments, apartment hotels, and hotels." (*Id.* ¶ 23 (quoting CITY OF MIAMI BEACH LAND DEV. CODE (the "City Code") §§ 142–212)). According to the City Code, "hotels" are only intended for occupancy by transient residents, and "apartments" require cooking facilities. (*Id.* (quoting City

Code § 114-1)).  The City Code permits transient rentals for apartment hotels and apartments in RM-2 zones.  (*See id.* ¶ 24).  The Sadigo's original City-issued certificates of use and occupancy ("CO[s]") were for use as apartments, and the Sadigo has maintained this status.  (*See id.* ¶ 22).  For a period of time, the Sadigo rented units on an annual basis.  (*See id.* ¶ 25).

In 2006, after obtaining a state transient public lodging establishment license from the Florida Department of Business and Professional Regulation's Division of Hotels and Restaurants, the Sadigo resumed transient rentals.  (*See id.* ¶¶ 25–26).  The Sadigo is licensed for transient apartment rentals.  (*See id.* ¶ 26).  Plaintiffs verified with the City that transient apartment rentals are legally permissible for the zoning district and the COs applicable to the Sadigo.  (*See id.* ¶ 27).  Plaintiffs obtained a City Resort Tax Registration Certificate for the Sadigo, required for transient (six months or less) rentals of hotel and apartment units.  (*See id.* (citing City Code §§ 102–306)).

Upon renting to transient guests in late 2006, the Sadigo constructed a cold food preparation area in the Sadigo's interior courtyard "pursuant to a City-approved and issued building permit."  (*Id.* ¶ 29).  "After construction was completed and signed[-]off [] by the City, the City informed Plaintiffs that it was a 'hotel[,]' not an 'apartment' . . . ."  (*Id.*).  The City required the Sadigo to obtain a new CO as a "hotel" because it rented apartments to transient guests and operated a food preparation area that was actually a "restaurant."  (*Id.*).  Plaintiffs complied and applied for a CO as a "hotel" (*id.* ¶ 31), and afterward, were told the Sadigo must comply with the fire protection standards applicable to "brand new hotel structures" (*id.* ¶ 32 (internal quotation marks omitted)).

From 2006 to 2012, Plaintiffs received numerous notices of violation and cease and desist

orders[2] from the City citing the Sadigo for violating City fire safety codes by allowing transient rentals of its apartments.  (*See id.* ¶ 50).  The City Building Official issued a decision requiring the installation of a fire sprinkler system and refused to accept an Engineer's Equivalency Report from the Sadigo explaining why a fire sprinkler system was unnecessary.  (*See* App. Exs., Ex. 8 [ECF No. 17-8]).   On April 15, 2010, the City Board of Rules and Appeals (the "BORA") considered the Sadigo's appeal of the Building Official's decision.  (*See id.*).   The BORA affirmed the Building Official's determination and notified Eisenberg of its decision in an April 21, 2010 letter.  (*See id.*).

Plaintiffs objected to the City's classification of the Sadigo as a new hotel and attended a City Commission meeting on January 19, 2011.  (*See id.* ¶ 29).   At the meeting, Plaintiffs submitted a letter and materials explaining the various reasons the Sadigo should not be treated as a new hotel.  (*See id.*).   The Mayor, City Commissioners, City Manager, and City Attorney were indifferent and the City Fire Chief took offense to Plaintiffs' claims of unfair treatment. (*See id.*).   Plaintiffs believe the City Fire Marshall told the Sadigo's mortgagee the Sadigo was illegally operating as a hotel.  (*See id.* ¶ 38).   On January 21, 2011, the Sadigo's mortgagee advised it would not renew its loan after previously encouraging Plaintiffs to renew the Sadigo's loan.  (*See id.* ¶ 37).   Plaintiffs were left with no choice but to refinance the Sadigo at a higher interest rate — an enormous additional cost.  (*See id.*).

---

[2] The City issued the Sadigo: a November 5, 2007 Fire Inspection Report and Cease and Desist Notice (*see* App. Exs., Ex. 1 [ECF No. 17-1]); a June 27, 2011 Fire Inspection Report and Cease and Desist Order (*see id.*, Ex. 5 [ECF No. 17-5]); a September 23, 2011 Cease and Desist Order and Fire Inspection Report and a September 29, 2011 Notice of Fire Violation (*see id.*, Ex. 6 [ECF No. 17-6]); and October 20, 2010, April 5, 2011, and September 27, 2011 Notices of Violation and October 23, 2007 Fire Inspection Report (*see id.*, Ex. 7 [ECF No. 17-7]).  The City also issued a March 15, 2010 response letter (*see id.*, Ex. 9 [ECF No. 17-9]) by the Fire Marshall regarding the Sadigo's engineering report, and a June 28, 2011 Plans Processing Approvals notice (*see id.*, Ex. 10 [ECF No. 17-10]).  These exhibits are in the public record and are attached to the City's Motion.  (*See generally* App. Exs. [ECF No. 17]).  They can therefore be considered on a Rule 12(b)(6) motion.  *See infra*, Part II (discussing legal standard).

In 2011, Eisenberg Development filed a petition in the Eleventh Judicial Circuit Court of Florida seeking a temporary injunction against the City.[3]  (*See* App. Exs., Ex. 4 at 2 [ECF No. 17-4]); *see also Eisenberg Dev. Corp. v. City of Miami Beach*, No. 11-20234 CA 15 (Fla. 11th Cir. Ct. 2012).  On January 5 and 6, 2012, the state trial court held an evidentiary hearing regarding compliance with the Florida Fire Prevention Code ("Fire Code").  (*See id.*).  On January 10, 2012, the trial court denied the temporary injunction for failure to satisfy the requirements for injunctive relief.  (*See id.* 5).

In April 2011, the City informed the Sadigo's longstanding client, the Art Basel Foundation, the Sadigo was illegally operating as a hotel.  (*See* Compl. ¶ 39).  The Foundation then severed its business relationship with Plaintiffs.  (*See id.*).  In June 2011, the City sent undercover police officers to the Sadigo to verify the Sadigo was renting to transient guests.  (*See id.* ¶ 40).  After observing transient rental activity, the City's police officers shut down the Sadigo for noncompliance with City fire codes, evicting the Sadigo's tenants and guests.  (*See id.*).  This shutdown caused the Sadigo's largest client, responsible for over $100,000 in annual revenue, to sever its business relationship with Plaintiffs.  (*See id.* ¶ 41).

In December 2011, fifteen police offers, ten code enforcement officers, including Alberto, and five fire officials forcibly shut down the Sadigo for a second time for violations of City fire codes.  (*See id.* ¶ 42).  The shut down occurred while the Sadigo was hosting the "Poo[l] Art Fair" during the renowned Art Basel Miami Beach art show, forcing guests to vacate the premises in one hour.  (*Id.* ¶¶ 42–43).  Alberto offered to solve Eisenberg's problems "by

---

[3] The Florida Third District Court of Appeal affirmed, *per curium*, the trial court's non-final, January 10, 2012 Order.  *See Eisenberg Dev. Corp. v. City of Miami Beach*, 100 So. 3d 702, 702 (Fla. 3d DCA 2012). The City only provided the January 10, 2012 Order, and most of the record is not readily available to the Court. As the judicial record provided is incomplete, the Court is unable to take notice of relevant documents.

using 'his people,' insinuating a bribe would be due from [] Eisenberg. When [] Eisenberg refused by stating he already had legal counsel working on it, Alberto stated . . . Eisenberg would not get far using legal means." (*Id.* ¶ 44). Eisenberg was then arrested. (*See id.* ¶ 45). In April 2012, Alberto and other code compliance officers and fire department inspectors were arrested for bribes they accepted in June 2011. (*See id.* ¶ 46). Since these arrests, the Sadigo has not received any further code compliance notices or violations. (*See id.* ¶ 47).

In the Complaint, Plaintiffs allege the following claims: violation of Plaintiffs' right to equal protection of law under the Fifth and Fourteenth Amendments to the U.S. Constitution (Count I) (*see id.* ¶¶ 63–70); First Amendment retaliation against Plaintiffs (Count II) (*see id.* ¶¶ 71–78); violation of due process of law under 42 U.S.C. sections 1983 and 1988 (Count III) (*see id.* ¶¶ 79–86); violation of due process of law under Articles I and X of the Florida Constitution (Count IV) (*see id.* ¶¶ 87–94); violation of Florida Statute section 509.013 (Count V) (*see id.* ¶¶ 95–102); violation of Florida Statute section 633.202 (Count VI) (*see id.* ¶¶ 103–110); and declaratory relief under 28 U.S.C. section 2201 and Florida Statute section 86.021 (Count VII) (*see id.* ¶¶ 111–12). Plaintiffs seek declaratory and injunctive relief and damages. (*See id.* ¶¶ 63–119). The City moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), or alternatively to strike the Complaint as a "sham pleading." (Mot. 1).

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550

U.S. at 555).   Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."   *Twombly*, 550 U.S. at 555.  Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss."   *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).   To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss."   *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).

When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true.   *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).   The Court is "not, however, bound to accept as true a legal conclusion couched as a factual allegation."   *Dhillon v. Zions First Nat. Bank*, 462 F. App'x 880, 883 (11th Cir. 2012) (citation omitted).   Likewise, "[c]onclusory allegations and unwarranted deductions of fact are not admitted as true, especially when such conclusions are contradicted" by exhibits or other disclosed facts.   *Id.* (alteration in original) (footnote call number omitted) (quoting *Assoc. Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974)).

Although a district court must generally convert a motion to dismiss into a motion for summary judgment if the court considers materials outside the complaint, a court may consider documents attached to the complaint or incorporated by reference without converting the motion into a motion for summary judgment if the documents are: (1) central to the complaint, and (2) the documents' authenticity is not in dispute.   *Day v. Taylor*, 400 F.3d 1272, 1275–76 (11th Cir.

2005).  In particular, the Court may "take judicial notice of and consider documents which are public records, [and] that are attached to the motion to dismiss, without converting the motion to dismiss into a motion for summary judgment."  *Id.*  Where the documents are in the public record, they are "'not subject to reasonable dispute' because they [are] 'capable of accurate and ready determination by resort to sources whose accuracy [can]not reasonably be questioned.'" *Horne v. Potter,* 392 F. App'x 800, 802 (11th Cir. 2010) (alterations added) (quoting FED. R. EVID. 201(b)).  Courts may likewise "take [judicial] notice of a another court's order . . . for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of that litigation."  *Id.* (alternations in original) (quoting *United States v. Jones,* 29 F.3d 1549, 1553 (11th Cir. 1994)).

### III. ANALYSIS

The City moves to dismiss all counts in the Complaint, or in the alternative to strike the Complaint as a sham pleading.[4]  (*See generally* Mot.).  The City first argues the doctrine of collateral estoppel precludes Plaintiffs from re-litigating issues already adjudicated in prior proceedings.  (*See id.* 7–12).  As to Counts III and IV, respectively, the City contends Plaintiffs were afforded procedural due process under federal and state law and failed to exhaust their administrative remedies.  (*See id.* 15).  The City also asserts Plaintiffs do not state plausible claims for a violation of equal protection (Count I) or First Amendment retaliation (Count II).  (*See id.* 12–15).  According to the City, Plaintiffs' state law claims in Counts V and VI, respectively, fail as Plaintiffs misconstrue Florida Statutes, sections 509.032(7) and 633.202(6).

---

[4] The City urges the Court to strike the Complaint as a "sham" pleading pursuant to the Court's inherent authority.  (*See generally* Mot.).  Plaintiffs' contention the Complaint is not a sham and was not submitted in bad faith (*see* Response ("Resp.") 17 [ECF No. 24]) is described by Defendant as "a fraud upon the Court."  (Reply 1 [ECF No. 33]).  While the City argues in favor of striking the pleading as a "sham," it does not provide any legal support for its argument.  Accordingly, the Court only considers whether the Complaint fails to state a claim for relief under Rule 12(b)(6).

(*See id.* 15–18).  Last, the City asserts the equitable relief sought in Count VII is inappropriate where Plaintiffs have adequate remedies at law.  (*See id.* 18).

Plaintiffs assert prior, non-final adjudications do not collaterally estop them from bringing the claims in their Complaint.  (*See* Resp. 4).  As to Count I, Plaintiffs claim they sufficiently plead a "class of one" equal protection violation.  (*See id.* 7).  Regarding Count II, Plaintiffs insist the City's enforcement actions were pretextual and in retaliation for Plaintiffs' protected free speech.  (*See id.* 12–13).  As to Counts III and IV, Plaintiffs assert they state claims for substantive due process under federal and state law.  (*See id.* 13–15).  And Plaintiffs explain Counts V and VI state claims against the City for exceeding its authority by unconstitutionally acting in contravention of Florida statutory law.  (*See id.* 15).

As further support for its arguments, the City insists its actions to enforce the City Code were legitimate, rational, and non-discretionary.  (*See generally* Reply).   The City explains the Plaintiffs' change in use from non-transient to transient rentals "unquestionably required [P]laintiffs to apply for and acquire a new CO."  (*Id.* 2).  According to the City, the application for a new CO "triggered a non-discretionary review by administrative agencies regarding whether the Sadigo complied with governing law[,]" including applicable fire and building codes.  (*Id.*).  The City cannot "permit occupancy where a building lacks required fire safety measures."  (*Id.*).  And here City officials concluded the Sadigo "did not meet the necessary fire and safety standard . . . [and lacked] a proper fire sprinkler system . . . , [so] a new CO never issued."[5]  (*Id.* 3–4).

---

[5] While the City's position is simple enough, the City repeatedly makes statements about the correct statutory interpretation of the City Code, the Florida Building Code, and the Florida Fire Code, among others, without citing any authority regarding those interpretations.  The Court will not consider unsupported legal conclusions in the Court's analysis of the Motion.  *See Solis-Ramirez v. U.S. Dep't of Justice*, 758 F.2d 1426, 1429 (11th Cir. 1985) (observing a district court "is not required to accept as true

The Court first addresses the collateral estoppel and exhaustion of remedies arguments before turning to Plaintiffs' equal protection, First Amendment, and due process claims against the City.  Last the Court addresses Plaintiffs' Florida statutory claims, followed by the "claim" for declaratory relief.

### A.  Collateral Estoppel

The affirmative defense of collateral estoppel may be raised in a Rule 12(b)(6) motion to dismiss, "where the existence of the defense can be judged on the face of the complaint." *Haddad v. Dudek*, 784 F. Supp. 2d 1308, 1324 (M.D. Fla. 2011) (citing *Concordia v. Bendekovic*, 693 F.2d 1073, 1075 (11th Cir. 1982); *Stephens v. State Farm Fire & Cas. Co.,* No. 1:03–CV–3094–JTC, 2004 WL 5546250, at *1 (N.D. Ga. June 23, 2004)).  Under Florida law, for Plaintiffs' claims to be precluded by the doctrine of collateral estoppel: "(1) an identical issue, (2) [must have] been fully [and fairly] litigated, (3) by the same parties or their privies, and (4) a final decision [must have] been rendered by a court of competent jurisdiction." *Wingard v. Emerald Venture Florida, LLC*, 438 F.3d 1288, 1293 (11th Cir. 2006) (alterations added; citations omitted) (quoting *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1329 (11th Cir. 2003).  The litigated issue must also have been "a critical and necessary part of the prior determination."  *Id.* (citations omitted).

According to the City, the doctrine of collateral estoppel precludes re-litigation of essential issues of fact and law adjudicated in prior proceedings.  (*See* Mot. 11).  The City asserts the following underlying issues were previously litigated:

> (i) whether a new CO was required; (ii) whether operation of the Sadigo for transient use without a new CO was permissible; and (iii) whether it was

---

[a party's] conclusions of law when considering a Rule 12(b)(6) motion to dismiss" (citing *Associated Builders, Inc. v. Alabama Power Co.,* 505 F.2d 97, 100 (5th Cir. 1974))).

necessary for [P]laintiffs to bring the Sadigo into compliance with Building and Fire Code (through, among other things, installation of a sprinkler system) before [Plaintiffs] could lawfully conduct the transient use.

(Reply 4).

Although the City never expressly requests the Court take notice of any records or proceedings, the City cites case law to support its contention that the Court must take judicial notice of the public record related to the instant action. (*See* Mot. 11). Yet the City largely fails to include as exhibits those public records it seeks the Court to judicially notice. Under Federal Rule of Evidence 201(c)(2), the court "must take judicial notice if a party requests it *and the court is supplied with the necessary information*." FED. R. EVID. 201(C)(2) (emphasis added). The City submits only two exhibits regarding the prior judicial history related to the instant action: the January 10, 2012 Order Denying Petitioner's Amended Motion for Emergency Temporary Injunctive Relief (*see* App. Exs., Ex. 4), and the April 2010 Board of Rules and Appeals decision (*see id.*, Ex. 8).[6]

Many of the facts and prior findings relevant to the issue of collateral estoppel are outside the pleadings. "Because questions relating to the affirmative defense[] of . . . collateral estoppel require consideration of matters beyond the four corners of the Complaint in this case [and the exhibits attached to the City's Motion], the Court cannot resolve this disputed issue on a motion to dismiss." *Steinberg v. Alpha Fifth Grp.*, No. 04-60899-CIV, 2008 WL 906270, at *2 n.1 (S.D. Fla. Mar. 31, 2008); *see generally Concordia,* 693 F.2d 1073. The Court is not in a position to

---

[6] For example, the City references the following public records, but does not provide them: records or minutes of a "series of hearings before the State of Florida's Historic Building Task Force;" transcript of a "multi-day evidentiary hearing" resulting in a July 11, 2011 Order by the Eleventh Judicial Circuit Court of Florida; and transcript of an evidentiary hearing held on January 5 and 6, 2012 (corresponding to the January 10, 2012 Order supplied by the City (*see* App. Exs., Ex. 4)).

make an informed determination[7] regarding the City's argument that dismissal is warranted under the doctrine of collateral estoppel.  It is not apparent from the face of the Complaint that Plaintiffs are estopped from bringing their claims.  To the extent the City's Motion relies on the doctrine of collateral estoppel, it is denied.

### B.  Equal Protection

Plaintiffs claim in Count I the City's enforcement of the City Code regarding the Sadigo's CO and compliance with the Fire Code violated Plaintiffs' rights to equal protection under the Fourteenth Amendment.  (*See* Compl. ¶ 64).  The City argues Plaintiffs fail to sufficiently plead an equal protection violation because they do not identify any comparators who were treated differently from Plaintiffs.  (*See* Mot. 12–13).  And even assuming Plaintiffs were treated differently from others similarly situated, the City's actions are supported by a rational basis.  (*See id*. 13–14; Reply 5–6).  Plaintiffs explain they bring this claim under a "class of one" theory.  (Resp. 7).  Further, Plaintiffs insist the City's actions were ill-motivated and constitute harassment.  (*See id*. 9).

The Equal Protection Clause provides that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const., amend. XIV, § 1.  In *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), the Supreme Court explained, "[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."  *Id*. (internal quotation marks and citations omitted). As a result, the Supreme Court has "recognized successful equal protection claims brought by a

---

[7]  The Court  likewise  cannot  make  an  informed  determination  regarding  the  issue  of  exhaustion  of remedies.

'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* (citations omitted) (recognizing plaintiff's class of one equal protection claim where the defendant village demanded a thirty-three-foot easement to connect plaintiff's property to the municipal water supply, when the village required only a fifteen-foot easement for other property owners). As the Eleventh Circuit has emphasized, "[t]o prove a 'class of one' claim, the plaintiff must show (1) that he was treated differently from other similarly situated individuals, and (2) that the defendant unequally applied a facially neutral [regulation] for the purpose of discriminating against him." *Leib v. Hillsborough Cnty. Pub. Transp. Com'n*, 558 F.3d 1301, 1307 (11th Cir. 2009) (citation omitted).

Class of one equal protection claims generally require plaintiffs to identify comparators in the pleading in order to show intentional, discriminatory treatment different from others similarly situated. *See generally Olech*, 528 U.S. 562; *Campbell v. Rainbow City*, 434 F.3d 1306 (11th Cir. 2006); *Glover v. Mabrey*, 384 F. App'x 763 (10th Cir. 2010). Indeed, "in the context of 'class of one' claims," "the 'similarly situated' requirement must be rigorously applied." *Leib*, 558 F.3d at 1307 (citing *Douglas Asphalt Co. v. Qore, Inc.*, 541 F.3d 1269, 1275 (11th Cir. 2008); *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007)). The purpose of the similarly situated requirement is to avoid "subject[ing] nearly all state regulatory decisions to constitutional review in federal court and deny[ing] state regulators the critical discretion they need to effectively perform their duties." *Leib*, 558 F.3d at 1307 (alteration added) (quoting *Griffin*, 496 F.3d at 1203). And "[e]ven in run-of-the-mill discrimination cases, [the Eleventh Circuit has] emphasized that plaintiffs are not permitted simply to 'rely on broad generalities in identifying a comparator.'" *Id.* (alteration added) (quoting *Griffin*, 496 F.3d at 1204 (analyzing

whether comparators were "prima facie identical in all relevant respects" (citation omitted))).[8]

The Seventh Circuit, writing extensively on class of one equal protection issues, has developed an exception to the traditional requirement that plaintiffs must identify comparators to state a claim. *See Swanson v. City of Chetek*, 719 F.3d 780, 784 (7th Cir. 2013). The Seventh Circuit recognizes class of one claims in cases where illegitimate governmental conduct or "animus is easily demonstrated[,] but similarly situated individuals are difficult to find." *Id.* "If animus is readily obvious" based on treatment received by plaintiff, he does not need to show unequal treatment by comparison to others similarly situated. *Id.* (finding the defendant's animus was "readily obvious" from the fact that the defendant "bore [the plaintiffs] ill will, caused an investigation against [one plaintiff], interrupted meetings of the plaintiffs and building inspectors and angrily informed building inspectors that no permit should be granted"); *see also Fenje v. Feld*, 398 F.3d 620, 628 (7th Cir. 2005) (recognizing a "campaign of official harassment" driven by "malice, vindictiveness, or malignant animosity would state a claim for relief under the Equal Protection Clause") (internal quotation marks and citations omitted).

Plaintiffs rely in particular on *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012). In *Geinosky*, plaintiff's unequal treatment was obvious from the pattern of deliberate, official harassment that had "no conceivable legitimate purpose[,]" where the plaintiff received twenty-four bogus parking tickets within one year from the same police unit. *Id.* at 748 (noting plaintiff

---

[8] The Eleventh Circuit has stated that the "similarly situated" requirement will be more difficult to establish for class of one cases with "multi-dimensional," governmental decision-making over a period of time. *Griffin*, 496 F.3d at 1203 ("involving varied decisionmaking criteria applied in a series of discretionary decisions made over an extended period of time"). In *Griffin* the court explained the equal protection claim must be evaluated "in light of the full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in making the challenged decision." *Id.*; *see also Campbell*, 434 F.3d at 1314, 1316 (considering factors relevant to an objective decisionmaker's approval of a building project, including development size, impact on the community, zoning variances, and type of approval sought, and observing a similarly situated building project would be "prima facie identical in all relevant respects").

did not need to identify a similarly situated comparator, specifically a "person who did not receive twenty-four bogus parking tickets in 2007 and 2008[,]" as the general public could serve the same purpose).  The Seventh Circuit also observed that even where a plaintiff may need to identify others who are similarly situated, the "pleading requirements under *Iqbal* and *Twombly* do not require a plaintiff to identify specific comparators in a complaint."  *Id.* at 748 n.3; *see also Cahn v. City of Highland Park*, No. 11 CV 06082, 2012 WL 4483480, at *4 (N.D. Ill. Sept. 25, 2012) (denying defendants' motion to dismiss the equal protection claim after finding plaintiff's allegations of being  "targeted" by the City "in a spiteful manner[,]" wherein plaintiff was "the only individual that Highland Park ha[d] prosecuted[,]" were sufficient to plead a class-of-one claim).

While much of the Eleventh Circuit's case law reiterating the demanding "similarly situated" standard predates *Geinosky*, since then, the Eleventh Circuit required in *Apothecary Development Corp. v. City of Marco Island, Florida*, more than "[b]are allegations" that others similarly situated were treated differently.  517 F. App'x 890, 892 (11th Cir. 2013) ("Plaintiffs' complaint baldly asserts that the alleged harassing behavior 'is being directed at and executed against Plaintiffs and their customers only, and not against similarly situated pharmacies, employees and customers in the Marco Island area' . . . . This is insufficient." (internal citation omitted)).   Still, since *Geinosky*, the Eleventh Circuit has not specifically addressed the contention that certain factual scenarios, including actions evincing obvious animus or harassment by a defendant, may not require a plaintiff to identify a comparator to state a claim for unequal treatment at the pleading stage.  Even assuming the Eleventh Circuit recognized a class of one claim without the requirement of pleading a similarly situated comparator, the threshold standard for conduct so obviously harassing or malicious is a challenging one.

Plaintiffs do not identify any comparators in the Complaint and only generally allege the treatment received by Plaintiffs was different from that of others similarly situated.[9]  But for Plaintiffs to state a class of one claim, they need to allege at least one similarly situated comparator.[10]  While the Seventh Circuit's analysis is persuasive, under that Circuit's standard Plaintiffs still fail to state an equal protection claim as they have not sufficiently pleaded such obviously harassing or malicious conduct on the City's part so that unequal treatment may be inferred.  *See Geinosky*, 675 F.3d at 748 (explaining the defendant's conduct had "no conceivable legitimate purpose"); *Fenje*, 398 F.3d at 628 (requiring plaintiff plead an obvious pattern of deliberate, official harassment driven by "malice, vindictiveness, or malignant animosity"); *see also Swanson*, 719 F.3d at 784.

Admittedly, Plaintiffs allege a "pattern of pretextual regulat[ion]" (Compl. ¶ 59) motivated by "the City's malice and ill will" (*id.* ¶ 57).  Plaintiffs claim the "numerous notices of violation or cease and desist orders[,]" citing the Sadigo for fire safety code violations related to transient occupancy and use (*id.* ¶ 50), constitute an actionable "pattern of discriminatory actions" by the City (*id.* ¶ 59).  But the Sadigo's citations and two shutdowns by City officials (*see id.* ¶¶ 40, 42) over a period of six years, do not sufficiently demonstrate an obvious campaign of malicious harassment against Plaintiffs.  *Cf. Swanson*, 719 F.3d at 785 (explaining the plaintiff only needed to show "harassment, yelling, arbitrary denials and frivolous litigation do not normally follow requests for fence permits[,]" particularly where defendant's hostility and

---

[9] As Plaintiffs fail to satisfy the first prong of identifying similarly situated comparators under the class of one equal protection standard in the Eleventh Circuit, the Court does not consider the second prong as to whether a rational basis existed for the alleged unequal treatment of Plaintiffs.  *See Griffin*, 496 F.3d at 1207–08.

[10] Plaintiffs' failure to do so is particularly inexcusable when Plaintiffs could have sought the required information from the City through public records requests under the Florida Public Records Act, chapter 119, Florida Statutes.

personal hatred were readily apparent from defendant's alleged statements and behavior). Moreover, the City's actions are not arbitrary or irrational on their face, as in *Geinosky*. Rather, the City's conduct has a conceivable legitimate purpose — to obtain compliance with the City Code and protect the health and safety of the public. Consequently, Plaintiffs have failed to sufficiently state a claim for a violation of their equal protection rights.

### C. First Amendment Retaliation

In Count II, Plaintiffs claim the City violated their rights under the First and Fourteenth Amendments to the U.S. Constitution and seek equitable relief. (*See* Compl. ¶ 72). Plaintiffs contend the City's enforcement actions were pretextual and undertaken with improper and retaliatory motives, adversely affecting Plaintiffs' protected speech. (*See* Resp. 12–13). The City argues Plaintiffs fail to state a claim for First Amendment retaliation as the City acted to properly enforce applicable local laws. (*See* Mot. 14). The City also insists it acted within its discretion and was not motivated by ill-will, citing the significant lapse in time between Plaintiffs' protected conduct and the City's purported retaliation. (*See* Reply 7).

To state a retaliation claim, a plaintiff must establish: (1) "his speech or act was constitutionally protected;" (2) "the defendant's retaliatory conduct adversely affected the protected speech;" and (3) "there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005) (citations omitted); *see also Abella v. Simon*, 522 F. App'x 872, 873 (11th Cir. 2013). A plaintiff's "claim depends not on the denial of a constitutional right, but on the harassment [] received for exercising [his] rights." *Bennett*, 423 F.3d at 1253.

Regarding the first prong, the First Amendment "protects the rights of [free] speech and to petition for redress." *Abella*, 522 F. App'x at 873 (citing U.S. Const. amend. I; *United Mine*

*Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967)).  Plaintiffs allege they engaged in protected activity by "petitioning the City and its elected officials and by publically commenting on their dispute with the City regarding [the] Sadigo . . . ."  (Compl. ¶ 73; *see also* Resp. 12).  Defendants do not challenge Plaintiffs' activities constitute protected speech.

As to the second prong, a "plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights."  *Bennett*, 423 F.3d at 1254 (finding retaliatory acts, including "a prolonged and organized campaign of harassment by local police officers[,]" where defendants repeatedly followed, pulled over, cited and intimidated plaintiffs, as well as allegedly attempted to obtain arrest warrants against plaintiffs without probable cause and disseminated flyers depicting plaintiffs as criminals); *cf. Thompson v. Hall*, 426 F. App'x 855, 859–60 (11th Cir. 2011) (finding the level of harassment and intimidation alleged, including intimidation of non-parties and allegations against unnamed police deputies who followed plaintiffs and patrolled their neighborhood, would not deter a person of ordinary firmness from engaging in protected speech).  In applying the objective test of ordinary firmness, courts liberally construe whether the alleged conduct had an adverse effect, so while "[t]he effect on freedom of speech may be small, . . . there is no justification for harassing people for exercising their constitutional rights."  *Bennett*, 423 F.3d at 1254 (alteration in original) (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).  The adverse effect "need not be great in order to be actionable."  *Id*; *see also Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003) (explaining the retaliatory issuance of parking tickets totaling $35 in less than two months to punish plaintiff for speaking out would be sufficient to chill the speech of a person of ordinary firmness).

Plaintiffs claim the City's retaliatory conduct would likely deter a person of ordinary

firmness from exercising free speech, even though Eisenberg himself was not deterred. Specifically, Plaintiffs allege: the City misled Plaintiffs through the code compliance processes (Compl. ¶¶ 27–35, 48–56); the City repeatedly cited Plaintiffs for code violations (*see id.* ¶ 50); the City told Plaintiffs' mortgagee and clients the Sadigo was operating illegally as a hotel (*see id.* ¶¶ 36–39, 43); the City shut down the Sadigo twice, including once during a peak weekend (*see id.* ¶¶ 40–44); and Eisenberg was arrested after his refusal to pay the City a bribe during the second shutdown (*see id.* ¶¶ 42–45; Resp. 13).  This conduct, improperly motivated as alleged, would likely be sufficient to deter a person of ordinary firmness, especially as the adverse effect need not be substantial.

Regarding the third prong, to establish a causal connection, a plaintiff must show his protected conduct was a motivating factor behind the alleged retaliatory misconduct.  *See Bennett*, 423 F.3d at 1250.  Plaintiff must identify a sequence of events from which "a retaliatory motive can be inferred[,]" notwithstanding other non-retaliatory motives the defendant may harbor.  *Lippman v. City of Miami*, 719 F. Supp. 2d 1370, 1374 (S.D. Fla. 2010) (footnote call number omitted); *see also id.* n.4.

To determine if the protected conduct is a motivating factor, courts rely on the burden-shifting formula set forth in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977); *see also Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008) (resolving the "subjective motivation issue" pursuant to *Mt. Healthy*).  Under the *Mt. Healthy* formula,

> [o]nce the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant.  If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail . . . on summary judgment.

*Smith*, 532 F.3d at 1278 (alterations added; footnote call number omitted) (quoting *Thaddeus-X*

*v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) (citing *Mt. Healthy*, 429 U.S. at 287)).   In conjunction with the burden-shifting formula, courts also consider the temporal proximity between a plaintiff's exercise of free speech and the adverse effect in gauging the causal connection.  *See Ranize v. Town of Lady Lake, Fla.*, No. 5:11–cv–646–Oc–32TBS, 2012 WL 4856749, at *3 (M.D. Fla. Oct. 12, 2012).

Significantly, "this burden-shifting analysis is not appropriate at the motion to dismiss phase."  *Johnson v. Conway*, No. 1:13-CV-0524-RWS, 2013 WL 5493380, at *4 n.3 (N.D. Ga. Sept. 30, 2013); *see generally O'Bryant v. Finch*, 637 F.3d 1207 (11th Cir. 2011) (decided on summary judgment); *Smith*, 532 F.3d 1270 (same); *Thaddeus-X*, 175 F.3d 378 (same).   A determination as to whether a defendant would have taken the same action in the absence of the protected activity is premature when the parties have not conducted discovery.  *See Johnson*, 2013 WL 5493380, at *4 n.3 (explaining discovery may reveal whether defendant's conduct conformed with the county jail's general policy).  As a result, the Court addresses only whether Plaintiffs have met their burden in alleging their protected conduct was a motivating factor, and not whether the City has shown under the burden-shifting formula it would have taken the same actions absent Plaintiffs' protected conduct.

Plaintiffs must allege a causal connection between the adverse action and the exercise of free speech to establish Plaintiffs' protected conduct was a motivating factor.  As the City observes, a substantial temporal gap exists between Plaintiffs' protected speech and when the alleged misconduct by the City commenced.  (*See* Mot. 14–15).  It was not until late 2006, when Plaintiffs began renting units to transient guests, that the City instructed Plaintiffs to apply for a new CO to operate the Sadigo as a hotel.  Well before this, in 1993, Eisenberg lost a bid for a City proposal, and in 1995, Eisenberg challenged a City development project.  (*See* Compl. ¶¶

10–11).  This exercise of Plaintiffs' First Amendment rights is exceedingly attenuated from the time the City required the Sadigo obtain a new CO.  While Plaintiffs' allegations regarding events more than ten years before the City's alleged retaliatory conduct fail to persuade, the allegations concerning more recent conduct are somewhat more compelling.

Plaintiffs allege they, along with unnamed parties, made complaints about an abandoned hotel between 2004 and 2009.  (*See id.* ¶ 20).  The Complaint contains few details about the nature and frequency of these 'complaints' between 2004 and 2009 and to whom they were made.  These allegations, although nearer in time, are relatively bare.  Without more factual detail, the Court cannot assess whether a sufficient causal connection — and thereby a retaliatory motive — can be inferred prior to the City's requirement that the Sadigo apply for a new CO and undergo review as a new hotel for compliance with local and state laws.

However, Plaintiffs' allegations from 2009 and later identify protected conduct supporting a causal connection.  In 2009, Eisenberg complained to the City's Zoning Boarding regarding the same abandoned hotel; he later withdrew his objection after the City addressed the neighborhood's concerns with the building.  (*See id.*).  Then, on January 19, 2011, Plaintiffs challenged the classification of the Sadigo as a new hotel at a City Commission meeting.  (*See id.* ¶ 29).  After Plaintiffs complained at the January 19, 2011 meeting, the City told Plaintiffs' mortgagee the Sadigo was operating illegally, and on January 21, 2011, the mortgagee decided not to renew the loan.  (*See id*. ¶¶ 36–38).  Plaintiffs also assert their refusal to pay the City a bribe was a motivating factor behind Eisenberg's arrest during the City's second shutdown of the Sadigo.  (*See id.* ¶¶ 42–45; Resp. 13).

A retaliatory motive can be inferred from the City's alleged misconduct, which continued from roughly 2006 to 2012.  *See Lippman*, 719 F. Supp. 2d at 1374.  While the Complaint does

not contain many facts — particularly prior to 2006 — illustrating the City acted in retaliation to Plaintiffs' exercise of free speech, the allegations taken as a whole are sufficient to infer a retaliatory motive.  Therefore, the Motion is denied as to this count.

**D.  Due Process**

Plaintiffs allege federal and state law claims for declaratory and injunctive relief and seek damages for due process violations (Counts III and IV, respectively).  (*See* Compl. ¶¶ 79–94).  In the Motion the City argues Plaintiffs were afforded procedural due process under federal and state law and failed to exhaust their administrative remedies.  (*See* Mot. 15).  Plaintiffs clarify they are not making procedural claims, and assert they sufficiently allege substantive due process claims instead.  (*See* Resp. 13–14).

To state a claim for a violation of substantive due process under 42 U.S.C. section 1983, a plaintiff must allege: (1) "a deprivation of a constitutionally protected interest," and (2) such "deprivation was the result of an abuse of governmental power sufficient to raise an ordinary tort to the stature of a constitutional violation."  *Executive 100, Inc. v. Martin Cnty.*, 922 F.2d 1536, 1541 (11th Cir. 1991) (citation omitted).  Deprivations of constitutionally protected interests may include diminutions in property value, *see Parker v. Leon Cnty.*, No. TCA 91-40133-WS, 1992 WL 209626, at *6 (N.D. Fla. Mar. 18, 1992) (citing *Executive 100*, 922 F.2d at 1541); and interference with the goodwill of plaintiff's business or injury to plaintiff's business without due process, *see Marrero v. Hialeah*, 625 F.2d 499, 515 (5th Cir. 1980).  Florida law recognizes a lawful business, including tangible property, monetary investments, and business reputation, "in every sense of the word[, as] property . . . that is entitled to protection from all unlawful

interference."[11]   *Id.* at 514 (internal quotation marks and citation omitted); *see also Espanola Way Corp. v. Meyerson*, 690 F.2d 827 (11th Cir. 1982) (finding plaintiff stated a section 1983 claim where city commissioners harassed hotel to drive it out of business, effecting a taking of plaintiff's hotel without due process, because Florida law considers business reputation/good will a constitutionally protected interest).   "A deprivation is of constitutional stature if it is undertaken for improper motive and by means that were pretextual, arbitrary and capricious, and without rational basis." *Executive 100*, 922 F.2d at 1541 (noting, in a zoning context, the issue is whether the defendant's action "bore any substantial relation to the public welfare") (citation omitted).  State law substantive due process claims must satisfy the same standard.  *See Gardens Country Club, Inc. v. Palm Beach Cnty.*, 712 So. 2d 398, 403 (Fla. 4th DCA 1998) (citation omitted).

Plaintiffs' allegations satisfy the first prong.  Plaintiffs were denied their constitutionally protected right to utilize their property and engage in a legitimate rental business at the Sadigo. (*See* Resp. 14; Compl. ¶¶ 22–25, 35–45, 81–86).  The City does not contest Plaintiffs have a constitutionally protected property and business interest in the Sadigo.  Plaintiffs allege they had to refinance the Sadigo at enormous additional cost after the mortgagee decided not to renew the loan upon being informed the Sadigo was operating illegally as a hotel.  (*See* Compl. ¶ 37). Plaintiffs also lost the Art Basel Foundation as a business client after the City informed the Foundation the Sadigo was operating illegally.  (*See id.* ¶ 39).

Regarding the second prong, the City's improper and pretextual motivations may be inferred from the allegations of City corruption, as well as the sequence of events after 2006,

---

[11] Under Florida law, a plaintiff may recover actual damages for "defendant's disparaging comments about the plaintiff's business[, including comments intended] . . . to prevent others from dealing with the plaintiff." *Marrero*, 625 F.2d at 515 (citations omitted).

which when viewed in the light most favorable to Plaintiffs, tend to show the City specifically targeted the Sadigo. Not only did the City's second shutdown of the Sadigo coincide with peak rentals during the Art Basel Festival (*see id.* ¶¶ 18–19), but Eisenberg was arrested after refusing to pay a bribe to the City's then lead Code Compliance Officer (*see id.* ¶¶ 42, 44–45). Based on these allegations, it is plausible the City's actions were undertaken with an improper motive and were an abuse of discretion. Thus, Plaintiffs state a substantive due process claim for diminution in value, injury to the Sadigo's reputation, and interference with operating a legitimate business, resulting from the City's repeated cease and desist orders, targeting of the Sadigo's clients, and two forced shutdowns of the Sadigo.

### E.  State Law Claims

In Counts V and VI, Plaintiffs seek declaratory and injunctive relief for violations of Florida Statutes sections 509.032[12] and 633.202, respectively. Plaintiffs request the Court "find that the City is liable for violating the Plaintiffs' rights under section[s] 509.032 [and 633.202], Florida Statutes." (Compl. ¶¶ 102, 110). The City makes three arguments in support of dismissal of these state law claims: (1) City officials are not preempted from "inspecting [P]laintiffs' property or enforcing local and state ordinances requiring [P]laintiffs to comply with applicable fire and safety codes" (Mot. 16); (2) Plaintiffs are not entitled to a private right of action under the statutes (*see id.* 17); and (3) Plaintiffs failed to exhaust their available administrative remedies (*see id.* 18). In response, Plaintiffs assert the City exceeded its authority because it "unconstitutionally acted in contravention of and in avoidance of state law[,]" namely Florida Statutes sections 509.032 and 633.202. (*See* Resp. 15). Moreover, Plaintiffs clarify they seek only equitable relief and do not make any claims requiring a private right of action. (*See id.*

---

[12] Plaintiffs have clarified they plead a violation of section 509.032, not 509.13 as stated in the caption of Count V. (*See* Resp. 15; Compl. ¶¶ 95–97).

16–17). Finally, Plaintiffs insist the City has not demonstrated other administrative remedies are available for Plaintiffs to pursue regarding violations of these state statutes. (*See id.* 17).

It is unclear precisely what claims Plaintiffs attempt to bring in Counts V and VI. The titles given to Counts V and VI reference "violations" by the City of both statutes, and Plaintiffs' Response characterizes the claims as requests "for equitable relief from the City's violations of state statutes, namely sections 509.032 and 633.202." (Resp. 15). The Court first reviews Florida Statute section 509.032(7), followed by section 633.202(6).

　　1.　Florida Statute Section 509.032(7)

Florida Statute section 509.032(7) regarding "Public Lodging and Public Food Service Establishments" states in part:

(7)　Preemption authority —

　(a)　The regulation of public lodging establishments and public food service establishments, including, but not limited to, sanitation standards, inspections, training and testing of personnel, and matters related to the nutritional content and marketing of foods offered in such establishments, is preempted to the state. This paragraph does not preempt the authority of a local government or local enforcement district to conduct inspections of public lodging and public food service establishments for compliance with the Florida Building Code and the Florida Fire Prevention Code, pursuant to ss. 553.80 and 633.206.

　(b)　A local law, ordinance, or regulation may not restrict the use of vacation rentals, prohibit vacation rentals, or regulate vacation rentals based solely on their classification, use, or occupancy. . . .

FLA. STAT. § 509.032.

Plaintiffs allege the City "applied, interpreted[,] and enforced its Code and [] unwritten policies and practices [against the] Sadigo . . . to regulate it as a public lodging establishment . . . [and] restrict the use of vacation rentals . . . based solely on [] classification, use, or occupancy" in contravention of section 509.032. (Compl. ¶ 99). Plaintiffs' reliance on subsection 509.032(7)(b), however, is misplaced. This subsection refers to "vacation rentals," which the

statute defines as "any unit or group of units in a condominium, cooperative, or timeshare plan or any individually or collectively owned single-family, two-family, three-family, or four-family house or dwelling unit that is also a transient public lodging establishment." FLA. STAT. § 509.242(1)(c).

While the Sadigo's status as an apartment or a hotel may be at issue, Plaintiffs do not allege the Sadigo is condominium, cooperative, or timeshare plan, nor do they allege the Sadigo is an individually or collectively owned single-family or multi-family housing that is also a transient public lodging establishment. Yet, inexplicably, the Complaint states the Sadigo "offers vacation rentals, as defined by chapter 509, Florida Statutes." (Compl. ¶ 98). Nothing in the Complaint supports this allegation. The Court's "duty to accept the facts in the [C]omplaint as true does not require [the Court] to ignore specific factual details of the pleading in favor of general or conclusory allegations." *Griffin*, 496 F.3d at 1205–06. Based on the plain language of the statute and the facts alleged, the Sadigo cannot be classified as a vacation rental. As subsection (b) is inapplicable to the Sadigo, the Court does not consider the parties' arguments relating to that subsection.

In Count V, Plaintiffs also state "regulation of public lodging establishments is preempted to the state." (Compl. ¶ 97 (citing FLA. STAT. § 509.032(7))). Plaintiffs further explain the City "acted in contravention of and in avoidance of" (Resp. 15) the statute by "unconstitutionally exceed[ing] its authority" to Plaintiffs' detriment (*id.* 15–16). The Court construes Plaintiffs' arguments as clarifying Count V states a claim for preemption. The City contends Plaintiffs' "same statutory allegations were raised and rejected by both the Circuit Court and the Third District Court of Appeal in [P]laintiffs' previous litigation against the City." (Mot. 15–16). Again, the City has not provided the necessary documentation for the Court to

review to make this determination.  The parties also do not cite any legal authority other than the statute itself on the issue of preemption.

In determining whether local laws and the actions of local government are in contravention of a state statute, courts look to whether the statute expressly preempts that area. *See Tallahassee Mem'l Reg'l Med. Ctr., Inc. v. Tallahassee Med. Ctr., Inc.*, 681 So. 2d 826, 831 (Fla. 1st DCA 1996); *see also Shands Teaching Hosp. & Clinics, Inc. v. Mercury Ins. Co. of Fla.*, 97 So. 3d 204, 210 (Fla. 2012) ("In construing a statute, [courts] should give effect to legislative intent, which is discovered primarily through the plain language of the statute." (citing *BellSouth Telecomms., Inc. v. Meeks*, 863 So. 2d 287, 289 (Fla. 2003))).  "[W]here the Legislature expressly or specifically preempts an area, there is no problem with ascertaining what the Legislature intended."  *Tallahassee Mem'l Reg'l Med. Ctr., Inc*., 681 So. 2d at 831.  If the statutory intent is not expressly clear from the statute, courts may analyze the statute's implied intent.  *See id.* ("Implied preemption should be found to exist only in cases where the legislative scheme is so pervasive as to evidence an intent to preempt the particular area, and where strong public policy reasons exist for finding such an area to be preempted by the Legislature." (citations omitted)).

Here, the statute expressly states it "does not preempt the authority of a local government or local enforcement district to conduct inspections of public lodging and public food service establishments for compliance with the Florida Building Code and the Florida Fire Prevention Code, pursuant to [sections] 553.80 and 633.206."[13]  FLA. STAT. § 509.032(7)(a).  The legislative

---

[13] Under the statute, "public lodging establishment" includes both transient and non-transient establishments comprised of "any unit, group of units, dwelling, building, or group of buildings within a single complex of buildings which is rented to guests."  FLA. STAT. § 509.013(4)(a).  A transient rental is one "rented to guests more than three times in a calendar year for periods of less than 30 days or 1 calendar month, whichever is less, or which is advertised or held out to the public as a place regularly rented to guests."  *Id.* § 509.013(4)(a)(1).  A nontransient rental is "rented to guests for periods of at least

Case No. 13-23620-CIV-ALTONAGA/Simonton

intent is clear from the face of the statute.  While the statute generally preempts regulation of public housing establishments, it exempts certain regulation by local government.  The statute does not preempt the City from conducting inspections of public lodging establishments such as the Sadigo[14] to ensure compliance with the Florida Building Code and Fire Code.  As a result, Plaintiffs do not state a claim for preemption under section 509.032.

2.  Florida Statute Section 633.202(6)

The second statute Plaintiffs cite is Florida Statute section 633.202 regarding the Florida Fire Prevention Code.  That law provides:

> (6) The Florida Fire Prevention Code does not apply to, and no code enforcement action shall be brought with respect to, zoning requirements or land use requirements.  Additionally, a local code enforcement agency may not administer or enforce the Florida Fire Prevention Code to prevent the siting of any publicly owned facility, including, but not limited to, correctional facilities, juvenile justice facilities, or state universities, community colleges, or public education facilities. This section shall not be construed to prohibit local government from imposing built-in fire protection systems or fire-related infrastructure requirements needed to properly protect the intended facility.

FLA. STAT. § 633.202(6).

In Count VI, Plaintiffs allege the City impermissibly enforces the City Code, making determinations related to particular land uses (including uses as hotels or apartments, as well as transient or non-transient uses) in contravention of the Fire Code section 633.202.  (*See* Compl. ¶¶ 105–07).  As stated, the statute plainly provides, "[t]he Florida Fire Prevention Code does not apply to, and no code enforcement action shall be brought with respect to, zoning requirements or land use requirements."  FLA. STAT. § 633.202(6).  The statute expressly exempts zoning and

---

30 days or 1 calendar month, whichever is less, or which is advertised or held out to the public as a place regularly rented to guests for periods of at least 30 days or 1 calendar month." *Id.* § 509.013(4)(a)(2).

[14] Plaintiffs allege the Sadigo is a "public lodging establishment holding a valid license issued under chapter 509, Florida Statutes, by the Department of Business and Professional Regulation."  (Compl. ¶ 98).

land use requirements.  The Fire Code does not define "land use requirements," and Plaintiffs employ a liberal construction of the term.  Based on a plain reading of the statute, the Court finds Plaintiffs' argument unpersuasive.

In the field of land use regulation, "land use" encompasses: "(1) the type of use, such as whether it will be used for agricultural, commercial, industrial, or residential purposes; (2) the density of use, manifested in concerns over the height, width, bulk, or environmental impact of the physical structures on the land; (3) the aesthetic impact of the use, which may include the design and placement of structures on the land; and (4) the effect of the particular use of the land on the cultural and social values of the community . . . ."  *Land-use Regulation*, BLACK'S LAW DICTIONARY (9th ed. 2009) (quoting Peter W. Salsich Jr., *Land Use Regulation*, 1 (1991)).  Furthermore, section (6) utilizes the term "land use," rather than the terms "use" or "occupancy," terms found in other provisions of the Fire Code.  FLA. STAT. § 633.302(6); *see generally id.* § 633.206(3) ("occupancy levels," "specialized use"); *id.* § 633.218(3)(a) ("construction or renovation, alteration, or change of occupancy").  The Court is not convinced this statutory exemption applies as Plaintiffs claim it does, because no zoning or land use requirements are actually in question.[15]

More importantly, the last sentence in section (6) provides, "[t]his section shall not be construed to prohibit local government from imposing built-in fire protection systems or fire-related infrastructure requirements needed to properly protect the intended facility."  *Id.* § 633.202(6).  To the extent Plaintiffs claim preemption regarding Florida Statute section 633.202

---

[15] In Count VI, Plaintiffs attempt to claim the City impermissibly applied the Fire Code when making determinations regarding zoning and land use (*see* Compl. ¶¶ 106–07), areas exempted from Code enforcement.  Plaintiffs' argument regarding zoning makes little sense as the Sadigo's zoning is not in question.  Plaintiffs allege the Sadigo is located in an RM-2 zoning district (*see id.* ¶ 23), and transient rentals are permitted in apartments, apartment hotels, and hotels in RM-2 zoning districts (*see id.* ¶ 24).

in Count VI of the Complaint, the statute expressly states local government has the authority to regulate built-in fire protection systems or fire-related infrastructure requirements.  Likewise, the Florida legislature intended the Fire Code to be "interpreted by fire officials and local enforcement agencies in a manner that reasonably and cost-effectively protects the public safety, health, and welfare . . . ."  *Id.* § 633.212.  On a plain reading of both statutes, Plaintiffs have failed to state claims for preemption under sections 509.032 and 633.202.  As Plaintiffs do not state any claims under Florida law upon which relief can be granted, the Court need not address the type of equitable relief Plaintiffs seek in the Complaint or the City's arguments regarding a private cause of action or injunctive relief.

### F.  Declaratory Judgment

In Count VII, Plaintiffs seek equitable relief pursuant to 28 U.S.C. section 2201 and Florida Statute section 86.021 in the form of a declaratory judgment construing the parties' rights and obligations.  (*See* Compl. ¶¶ 111–19).  Although the City does not comment on whether Plaintiffs are entitled to declaratory relief (*see* Mot. 18; Reply 9–10), in Count VII, Plaintiffs fail to allege a separate cause of action, and accordingly, do not state a claim upon which independent relief can be granted.

The equitable relief Plaintiffs seek is a remedy, not a separate cause of action.  *See Perret v. Wyndham Vacation Resorts, Inc.*, 889 F. Supp. 2d 1333, 1346 (S.D. Fla. 2012) (dismissing count pleading injunctive and declaratory relief for failure to state a separate cause of action); *Tara Prods., Inc. v. Hollywood Gadgets, Inc.*, No. 09-CV-61436, 2010 WL 1531489, at *10 (S.D. Fla. Apr. 16, 2010) (dismissing count pleading remedy of equitable lien for failure to state separate cause of action); *see also Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005) ("[A]ny motion or suit for either a preliminary or permanent injunction must be

Case No. 13-23620-CIV-ALTONAGA/Simonton

based upon a cause of action . . . There is no such thing as a suit for a traditional injunction in the abstract.") (internal quotation marks and citation omitted).   Moreover, "[A] court should not entertain an action for declaratory relief when the issues are properly raised in other counts of the pleadings and are already before the court."   *Perret*, 889 F. Supp. 2d at 1346 (citation omitted). Plaintiffs already seek equitable relief in the other counts of the Complaint.   Accordingly, Count VII is dismissed.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant, the City of Miami Beach's Motion to Dismiss **[ECF No. 16]** is **GRANTED in part** and **DENIED in part**.   Counts I, V, VI, and VII are DISMISSED.

**DONE AND ORDERED** in Miami, Florida this 3rd day of March, 2014.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:  counsel of record