UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-23620-CIV-ALTONAGA/O'Sullivan

**ROD EISENBERG**, *et al.*,

    Plaintiffs,
vs.

**CITY OF MIAMI BEACH**,

    Defendant.
_____/

## ORDER

**THIS CAUSE** came before the Court on Defendant, City of Miami Beach's (the "City['s]") Motion for Judgment on the Pleadings . . . ("Motion") [ECF No. 52]. Plaintiffs, Rod Eisenberg ("Eisenberg") and Eisenberg Development Corp. ("Eisenberg Development") (collectively, "Plaintiffs") filed their Response . . . ("Response") [ECF No. 61], to which the City replied (*see* [ECF No. 67]). The undersigned has carefully considered the parties' written submissions, the record, and applicable law.

### I. BACKGROUND[1]

Between 2004 and 2009, Plaintiffs and others voiced many complaints about the health and safety risks and Code compliance violations of an abandoned hotel in their neighborhood. (*See id.* ¶ 20). The City investigated some of these complaints but did not resolve the problems with the abandoned building. (*See id.*). In 2009, Eisenberg urged the City's Zoning Board of Adjustment to handle the Code violations more quickly, requesting the Board deny the abandoned hotel owner's request for a one-year extension to comply with the Code. (*See id.*).

---

[1] The Background is largely reproduced from the March 3, 2014 Order [ECF No. 36] dismissing Counts I, V, VI, and VII of the Complaint [ECF No. 1].

Case 1:13-cv-23620-CMA   Document 97   Entered on FLSD Docket 09/19/2014   Page 2 of 20
CASE NO. 13-23620-CIV-ALTONAGA/O'Sullivan

The Zoning Board ultimately required the abandoned hotel owner to board the building and remove loose debris before granting the extension. (*See id.*). In light of this, Eisenberg withdrew his objection, and the Zoning Board later approved the extension. (*See id.*).

Between 2006 and 2012, multiple City officials were investigated and prosecuted for corruption. In 2006, a City electrical inspector was arrested for soliciting bribes (*see id.* ¶ 14); in 2008, a City fire protection analyst was fired after reporting suspicions of kickbacks (*see id.* ¶ 15), and a City planner, examiner, and inspector were all caught accepting bribes (*see id.* ¶ 16); in 2012, City procurement director, Gus Lopez, was charged with sixty-three felony counts, including racketeering, bid-tampering, and illegal compensation (*see id.* ¶ 17), and seven City Code compliance and fire department inspectors, including the City's lead code compliance officer, Jose Alberto ("Alberto"), were arrested for extortion and accepting bribes in June 2011 to bypass City Code enforcement inspections and fines (*see id.* ¶¶ 18–19).

The Sadigo Court Apartment Hotel (the "Sadigo") is a "contributing historic structure" in the City's Museum Historic District. (*Id.* ¶ 6). The Sadigo opened in 1936 as an apartment with transient rentals, and it has continued operating in this fashion without objection by the City. (*See id.* ¶ 22). The Sadigo is located in a RM-2 zoning district, where the "'main permitted uses' include apartments, apartment hotels, and hotels." (*Id.* ¶ 23 (quoting CITY OF MIAMI BEACH LAND DEV. CODE (the "City Code") §§ 142–212)). According to the City Code, "hotels" are only intended for occupancy by transient residents, and "apartments" require cooking facilities. (*Id.* (quoting City Code § 114-1)). The City Code permits transient rentals for apartment hotels and apartments in RM-2 zones. (*See id.* ¶ 24). The Sadigo's original City-issued certificates of use and occupancy ("CO[s]") were for use as an apartment building, and the Sadigo has maintained this status. (*See id.* ¶ 22). For a period of time, the Sadigo rented units on an annual basis. (*See id.* ¶ 25).

In 2006, after obtaining a state transient public lodging establishment license from the Florida Department of Business and Professional Regulation's Division of Hotels and Restaurants, the Sadigo resumed transient rentals, for which it is licensed. (*See id.* ¶¶ 25–26). Plaintiffs verified with the City that transient apartment rentals are legally permissible for the zoning district and the COs applicable to the Sadigo. (*See id.* ¶ 27). Plaintiffs obtained a City Resort Tax Registration Certificate for the Sadigo, required for transient (six months or less) rentals of hotel and apartment units. (*See id.* (citing City Code §§ 102–306)).

Upon renting to transient guests in late 2006, the Sadigo constructed a cold food preparation area in an interior courtyard "pursuant to a City-approved and issued building permit." (*Id.* ¶ 29). "After construction was completed and signed[-]off [] by the City, the City informed Plaintiffs that it was a 'hotel[,]' not an 'apartment' . . . ." (*Id.*). The City required the Sadigo to obtain a new CO as a "hotel" because it rented apartments to transient guests and operated a food preparation area that was actually a "restaurant." (*Id.*). Plaintiffs complied and applied for a CO as a "hotel" (*id.* ¶ 31), and were later told the Sadigo must comply with the fire protection standards applicable to "brand new hotel structures" (*id.* ¶ 32 (internal quotation marks omitted)).

From 2006 to 2012, Plaintiffs received numerous notices of violation and cease and desist orders[2] from the City citing the Sadigo for violating City fire safety codes by allowing transient rentals of its apartments. (*See id.* ¶ 50). In March 2010, the Miami Beach Fire Marshal, Sonia

---

[2] The City issued the Sadigo a November 5, 2007 Fire Inspection Report and Cease and Desist Notice regarding an October 23, 2007 inspection (*see* Appendix to Motion to Dismiss ("MTD App."), Ex. 1 [ECF No. 17-1]); a June 27, 2011 Fire Inspection Report and Cease and Desist Order (*see id.*, Ex. 5 [ECF No. 17-5]); a September 23, 2011 Cease and Desist Order and Fire Inspection Report and September 29, 2011 Notice of Fire Violation (*see id.*, Ex. 6 [ECF No. 17-6]); October 20, 2010, April 5, 2011, and September 27, 2011 Notices of Violation, and October 23, 2007 Fire Inspection Report (*see id.*, Ex. 7 [ECF No. 17-7]). The City also issued a March 15, 2010 response letter (*see id.*, Ex. 9 [ECF No. 17-9]) by the Fire Marshal regarding the Sadigo's engineering report, and a June 28, 2011 Plans Processing Approvals notice (*see id.*, Ex. 10 [ECF No. 17-10]).

Machen ("Machen"), sent Eisenberg and engineer, Thomas Maxwell ("Maxwell"), a letter in response to Maxwell's Engineer Equivalency Report on the Sadigo. (*See* MTD App., Ex. 9 [ECF No. 17-9]). The letter explained the Report's shortcomings in addressing the Florida Fire Prevention Code and identifying the historic features at risk from an accidental discharge of fire sprinklers. (*See id.* 1). The City Building Official issued a decision requiring the installation of a fire sprinkler system and refused to accept the Engineer's Equivalency Report from the Sadigo explaining why a fire sprinkler system was unnecessary. (*See* MTD App., Ex. 8 [ECF No. 17-8]). The City Board of Rules and Appeals (the "BORA") affirmed the Building Official's determination and notified Eisenberg of its decision in an April 21, 2010 letter. (*See id.*).

Plaintiffs objected to the City's classification of the Sadigo as a new hotel and attended a City Commission meeting on January 19, 2011. (*See id.* ¶ 29). At the meeting, Plaintiffs submitted materials explaining the various reasons the Sadigo should not be treated as a new hotel. (*See id.*). The Mayor, City Commissioners, City Manager, and City Attorney were indifferent, and the City Fire Chief took offense to Plaintiffs' claims of unfair treatment. (*See id.*). Plaintiffs believe the City Fire Marshal told the Sadigo's mortgagee the Sadigo was illegally operating as a hotel. (*See id.* ¶ 38). On January 21, 2011, that mortgagee advised it would not renew its loan after previously encouraging Plaintiffs to renew it. (*See id.* ¶ 37). Plaintiffs were left with no choice but to refinance the Sadigo at a higher interest rate — at enormous additional cost. (*See id.*).

In 2011, Eisenberg Development filed a petition in the state court seeking a temporary injunction against the City. (*See* MTD App., Ex. 4 at 2 [ECF No. 17-4]); *see also Eisenberg Dev. Corp. v. City of Miami Beach*, No. 11-20234 CA 15, 4 (Fla. 11th Cir. Ct. Jan. 10, 2012) (order denying emergency temporary injunction). The state trial court held an evidentiary hearing regarding compliance with the Florida Fire Prevention Code ("Fire Code"). (*See id.*).

On January 10, 2012, the court denied the request for a temporary injunction. (*See id.* 5). The trial court's decision was affirmed. *See Eisenberg Dev. Corp. v. City of Miami Beach*, 100 So. 3d 702, 702 (Fla. 3d DCA 2012).

In April 2011, the City informed the Sadigo's longstanding client, the Art Basel Foundation, the Sadigo was illegally operating as a hotel, and as a result the Foundation severed its business relationship with Plaintiffs. (*See* Compl. ¶ 39). In June 2011, the City sent undercover police officers to the Sadigo to verify the Sadigo was renting to transient guests. (*See id.* ¶ 40). After observing transient rental activity, City police officers shut down the Sadigo for noncompliance with City fire codes, evicting the Sadigo's tenants and guests. (*See id.*). This shutdown caused the Sadigo's largest client to sever its business relationship with Plaintiffs. (*See id.* ¶ 41).

In December 2011, fifteen police offers, ten code enforcement officers (including Alberto), and five fire officials forcibly shut down the Sadigo a second time for violations of City fire codes. (*See id.* ¶ 42). The shut down occurred while the Sadigo was hosting the "Poo[l] Art Fair" during the Art Basel Miami Beach art show, forcing guests to vacate the premises. (*Id.* ¶¶ 42–43). Alberto offered to solve Eisenberg's problems "by using 'his people,' insinuating a bribe would be due from [] Eisenberg. When [] Eisenberg refused by stating he already had legal counsel working on it, Alberto stated . . . Eisenberg would not get far using legal means." (*Id.* ¶ 44). Eisenberg was then arrested. (*See id.* ¶ 45). In April 2012, Alberto and other code compliance officers and fire department inspectors were arrested for accepting bribes. (*See id.* ¶ 46). Since these arrests, the Sadigo has not received any further code compliance notices or violations. (*See id.* ¶ 47).

The three remaining counts in the Complaint allege a First Amendment retaliation claim in Count II (*see* Compl. ¶¶ 71–78); violation of due process under 42 U.S.C. section 1983 in

5

Count III (*see id.* ¶¶ 79–86); and violation of due process under Articles I and X of the Florida Constitution in Count IV (*see id.* ¶¶ 87–94). The City now moves for judgment on the pleadings.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(c) "after the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). "'Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law.'" *Palmer & Cay, Inc. v. Marsh & McLennan Cos., Inc.*, 404 F.3d 1297, 1303 (11th Cir. 2005) (quoting *Riccard v. Prudential Ins. Co.*, 307 F. 3d 1277, 1291 (11th Cir. 2002)). In ruling on the motion, "[a]ll facts alleged in the complaint must be accepted as true and viewed in the light most favorable to the nonmoving party." *Scott v. Taylor*, 405 F.3d 1251, 1253 (11th Cir. 2005) (alteration added).

In resolving a motion for judgment on the pleadings, the Court considers the entire pleadings: the complaint, the answer, and any documents attached as exhibits. *McGath v. Hamilton Local School Dist.*, 848 F. Supp. 2d 831, 836 (S.D. Ohio 2012) (citations omitted). If "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material . . . ." FED. R. CIV. P. 12(c). A court may consider documents attached to the complaint or incorporated by reference without converting the motion into a motion for summary judgment if the documents are: (1) central to the complaint, and (2) the documents' authenticity is not in dispute. *Day v. Taylor*, 400 F.3d 1272, 1275–76 (11th Cir. 2005). In particular, the Court may "take judicial notice of and consider documents which are public records . . . ." *Id.* (alteration added).

## III. ANALYSIS

The City moves for judgment on the pleadings arguing much as it did in its Motion to

Dismiss the Complaint [ECF No. 16], that the Court should judicially notice and give deference to prior determinations made by municipal officials and organizations. (*See* Mot. 10–11; Reply 2). Again, the City contends the doctrine of collateral estoppel precludes Plaintiffs from re-litigating issues adjudicated in prior proceedings. (*See* Reply 2–4). Specifically with regard to Count II, the City maintains Plaintiffs do not state a plausible claim of First Amendment retaliation, challenging Plaintiffs' ability to establish a causal connection between the City's allegedly retaliatory actions and any adverse effect on Plaintiffs' speech. (*See* Mot. 11–14). As to Counts III and IV, the City argues Plaintiffs cannot state substantive due process claims under federal and state law, respectively, because an implied fundamental right is not at stake, and the City's efforts to enforce the Fire Code are rationally related to public health and safety. (*See* Mot. 15–17). The Court considers these issues, again, and in particular examines new authorities and arguments not addressed in the City's earlier briefing on the Motion to Dismiss which result in the City being afforded some of the relief it now seeks.

### A. Collateral Estoppel and Administrative Deference

Under Florida law, for Plaintiffs' claims to be precluded by the doctrine of collateral estoppel: "(1) an identical issue, (2) [must have] been fully [and fairly] litigated, (3) by the same parties or their privies, and (4) a final decision . . . rendered by a court of competent jurisdiction." *Wingard v. Emerald Venture Florida LLC*, 438 F.3d 1288, 1293 (11th Cir. 2006) (alterations added; citations omitted) (quoting *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1329 (11th Cir. 2003). The litigated issue must also have been "a critical and necessary part of the prior determination." *Id.* (citations omitted).

The City describes three categories of agency determinations it considers final and binding because Plaintiffs' claims were withdrawn, or the findings were not appealed or overturned on appeal. (*See* Mot. 4–9). The first category includes Fire Marshal determinations

resulting in notices of violation and cease and desist orders. (*See id.* 4–6). The second is City Building Official determinations, including BORA appeals. (*See id.* 7–8). The third category encompasses determinations by the Florida Historical Task Force. (*See id.* 8–9). The City also contends essential issues of fact and law were adjudicated in the prior state court proceeding denying Eisenberg Development's request for a temporary injunction against the City. (*See id.* 9). Given these prior determinations, the City insists the present claims are precluded because they concern identical underlying issues previously decided, and Plaintiffs[3] had the opportunity to be heard and present evidence. (*See id.* 4–10; Reply 2–4).

Plaintiffs contend the prior determinations did not address the constitutional issues raised here, specifically the allegedly pretextual and retaliatory nature of the City's conduct. (*See* Resp. 4–10). They further argue the determinations are not final and challenge whether they had a full and fair opportunity to litigate issues before municipal agencies, including the BORA and the Historical Task Force. (*See id.* 7–8).

The factors at issue — whether the prior proceedings involved identical issues critical to the prior determination, were fairly litigated, and are final determinations[4] — make it inappropriate to preclude Plaintiffs' claims on the basis of collateral estoppel. The opportunity to fully and fairly litigate the issues to be estopped is "the most significant consideration in

---

[3] The City argues Eisenberg and Eisenberg Development can reasonably be said to be in privity because Eisenberg is the president of Eisenberg Development (*see* Compl. ¶¶ 1–2), and Eisenberg Development owns and operates the Sadigo (*see id.* ¶ 6). *See Drier v. Tarpon Oil Co.*, 522 F.2d 199, 200 (5th Cir. 1975) (finding corporate president and major stockholder, who made ultimate decisions on corporation's behalf, was in privity with corporation so that president was estopped from re-litigating issues already decided by state court against corporation); *see also United States v. Weiss*, No. 698CR99ORL19KRS, 2005 WL 1126663, at *10 (M.D. Fla. May 6, 2005) (collecting cases).

[4] Where Plaintiffs declined to pursue their legal remedies or appeal, prior, un-appealed administrative and judicial decisions are considered final. *See Fla. Transp. Serv., Inc. v. Miami-Dade Cnty.*, 757 F. Supp. 2d 1260, 1271 (S.D. Fla. 2010) ("The administrative examiner's order affirming the denial of the January 2002 application constituted a final decision on the merits" and "failure to appeal, moreover, does not diminish the preclusive effect given to the administrative ruling." (citation omitted)).

determining whether to invoke collateral estoppel." *Hercules Carriers, Inc. v. Claimant State of Fla., Dept. of Transp.*, 768 F.2d 1558, 1580 (11th Cir. 1985) (citation omitted). Regarding the Fire Marshal's determinations, it appears Plaintiffs received no notice nor was a hearing held prior to the issuance of notices of violation or cease and desist orders, and there is little evidence Plaintiffs formally exercised their right to appeal.[5] In March 2010 Miami Beach Fire Marshal Machen sent Eisenberg and engineer Maxwell a letter in response to the Sadigo's equivalency report. (*See* MTD App., Ex. 9). After discussing the equivalency report's shortcomings, the Fire Marshal concluded an automatic fire sprinkler system was required absent an exemption from the Historical Task Force. (*See id.* 1–2). The letter also stated Eisenberg and Maxwell would receive a separate response from the City Building Official. (*See id.* 1).

The City Building Official, after refusing to accept Maxwell's equivalency report, issued a decision requiring the Sadigo to install a fire sprinkler system. (*See* Answer, Ex. 11 [ECF No. 51-11]). Plaintiffs formally appealed the City Building Official's decision. The extent to which the BORA provided a full and fair opportunity to litigate is unclear. The only filings in the record related to the BORA determination include an April 7, 2010 memorandum regarding the Sadigo's "Change of Division Within Same Occupancy" from an R-2 to an R-1 designation,[6] and an April 21, 2010 letter to Eisenberg notifying him of the BORA's decision. (*See id.*) The memorandum and letter explain the BORA affirmed the Building Official's determination that the Sadigo was not in compliance with Florida Building Code, Existing Section 305.1 (2007).

---

[5] Fire Marshal determinations may be appealed to the Fire Prevention and Safety Appeal Board. (*See* Mot. 6 (citing Miami-Dade County Code of Ordinances § 14-46 (D) (2014))).

[6] Plaintiffs do not dispute the authenticity or accuracy of the intra-agency document. To the extent Plaintiffs challenge the Court's ability to judicially notice the April 7, 2010 memorandum (*see* Resp. 3 n.4), the Court considers the document only to frame the scope of the issues before the BORA. The memorandum is directed to Herminio F. Gonzalez, P.E., the same individual who sent Eisenberg the BORA's April 21, 2010 decision letter.

(*See* Answer, Ex. 11 at 1–2).

The BORA narrowly examined the issue whether "the Building Official is incorrect in his interpretation of the Florida Building Code (Existing), 2007 Edition; Existing Section 1106, that an evaluation report shows each existing safety feature is in compliance with the Historic Buildings Chapter and additional installation of safety features would damage the integrity of the historic structure." (*Id.* at 1). The BORA reviewed the submitted equivalency report, found it incomplete, and determined the report did not substantiate the Sadigo's existing alternative fire prevention systems were in fact equivalent to a fire sprinkler system. (*See id.* 2). Because the scope of the BORA review was limited to considering an incomplete equivalency report, the BORA's finding is not given preclusive effect. *See Hercules Carriers, Inc.*, 768 F.2d at 1581 n.16 ("[W]hen the scope of the administrative hearing is much narrower than a subsequent lawsuit, collateral estoppel will not be applied." (citing *Garner v. Giarrusso*, 571 F.2d 1330, 1336 (5th Cir. 1978))).

The most comprehensive, quasi-judicial hearings seem to have been held by the Historical Task Force. There, Eisenberg presented arguments and evidence in person in an adversarial proceeding, including an expert's report and testimony, and the Task Force conducted an on-site tour of the Sadigo. (*See* Answer, Ex. 12 [ECF No.51-12]; App., Exs. 1–4 [ECF Nos. 53-1–53-4]).[7] But the Task Force's findings are limited by the agency's narrow advisory role identifying whether certain actions (such as Fire Code compliance measures)

---

[7] Plaintiffs challenge the authenticity of a May 27, 2010 Historical Task Force Committee Hearing transcript [ECF No. 53-1] because it was "not certified by a court reporter, so [sic] no way to ensure accuracy." (Resp. 3 n.4). They do not object that a hearing took place on May 27, 2010, nor identify any portions of the transcript as inaccurate. The Court takes judicial notice that multiple Task Force hearings were held in 2010 and 2013 addressing the Sadigo's historic preservation in the context of fire prevention and safety. Plaintiffs do not contest the authenticity of the other Task Force hearing transcripts in the record. (*See* [ECF Nos. 53-2–53-4]).

undermine the preservation of historic buildings. (*See generally* App., Ex. 1 (suggesting alternative installation methods to input a Code-compliant fire sprinkler system that simultaneously would not diminish the Sadigo's historic value)). Thus, the narrow scope of the Task Force's determinations do not support estoppel. *See Hercules Carriers, Inc.*, 768 F.2d at 1581 n.16.

The present case involves constitutional law claims relating to the exercise of free speech and due process, none of which was ever fully and fairly litigated nor decided by a court of competent jurisdiction. Despite prior agency determinations regarding related underlying factual issues, Plaintiffs' constitutional claims are not precluded by collateral estoppel.

Finally, the denial of Plaintiffs' petition for a temporary injunction does not preclude Plaintiffs from "the subsequent grant of permanent equitable relief." *David Vincent, Inc. v. Broward Cnty., Fla.*, 200 F.3d 1325, 1331 (11th Cir. 2000) (citations omitted). A preliminary injunction is "generally *not* considered final or conclusive." *Id.* (emphasis in original). The question before the state trial court was whether Plaintiffs had made the necessary showing to obtain a preliminary injunction allowing short-term rentals at the Sadigo without requiring alteration to the existing fire prevention systems. (*See generally* App., Exs. 19–20 [ECF Nos. 52-19–52-20]). The court found Plaintiffs failed to satisfy the requirements for a preliminary injunction, explaining they had not exhausted their administrative remedies and could pursue a remedy at law for money damages. *See Eisenberg Dev. Corp.*, No. 11-20234 CA 15 at 4. In denying the injunction, the court also stated Plaintiffs lacked a substantial likelihood of success on the merits, and the public life safety considerations outweighed potential lost profits or goodwill by the Sadigo. *See id.* At issue in this case is whether the City's conduct was an abuse of discretion, was improper, pretextual, or retaliatory, or resulted in a constitutional law violation.

Admittedly, "[a]n agency's interpretation of the guidelines that it is charged with administrating is entitled to judicial deference, and should not be overturned as long as the interpretation is in the range of permissible interpretations." *Atl. Shores Resort, LLC v. 507 South Street Corp.*, 937 So. 2d 1239, 1245 (Fla. 3d DCA 2006) (alteration added). To the extent City officials and municipal agencies have addressed discrete aspects regarding the underlying factual issues, the Court may have occasion to defer to municipal determinations where they are "within the range of possible permissible interpretations." *Id.* (quoting *Paloumbis v. City of Miami Beach*, 840 So. 2d 297, 298–99 (Fla. 3d DCA 2003)); *see also Metro. Dade County v. P.J. Birds, Inc.*, 654 So. 2d 170, 175 (Fla. 3d DCA 1995) (requiring a reviewing court to "defer to an agency's interpretation" if it "is consistent with legislative intent and is supported by substantial competent evidence" (citation omitted)). But such deference does not in itself satisfy the elements for collateral estoppel to bar the present constitutional law claims.

### B. First Amendment Retaliation

In Count II, Plaintiffs claim the City violated their rights under the First and Fourteenth Amendments to the U.S. Constitution and seek equitable relief. (*See* Compl. ¶ 72). The City asserts it acted properly to enforce local laws and Plaintiffs fail to show a causal connection. (*See* Mot. 11–14). Although the City contends its conduct was lawful, such "lawful conduct" does not preclude Plaintiffs' claim where "a retaliatory motive can be inferred" from a sequence of events, notwithstanding other non-retaliatory motives (here purportedly lawful grounds) the defendant may have. *Lippman v. City of Miami*, 719 F. Supp. 2d 1370, 1374 (S.D. Fla. 2010) (footnote call number omitted); *see also id.* n.4; *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of New York*, 746 F.3d 538, 544 (2d Cir. 2014) ("Royal Crown 'can prove First Amendment retaliation even if the measures taken by [defendants] were otherwise justified.' . . . [T]hat defendants . . . may have been justified in closing down Royal Crown based

on their regulatory responsibilities to enforce the Health Code does not insulate them from being 'subject to a claim of improper motive,' if defendants retained some discretion in how they performed their regulatory enforcement functions." (alterations added and in original) (quoting *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 152–53 (2d Cir. 2006))). Here, the fact that even a historic hotel may be required to install fire sprinklers absent an approved, equivalent alternative does not resolve whether the City's conduct was retaliatory or improperly motivated, particularly early on when the Sadigo was directed by the City to apply for a new CO as a hotel.

The City urges the Court to apply a modified causation test (requiring proof of selective enforcement) based on *Osborne v. Grussing*, 477 F.3d 1002, 1006 (8th Cir. 2007), in lieu of the well-established burden-shifting test from *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977), applied in the March 3 Order. (*See* Mot. 14–15; Reply 7). Since the *Osborne* decision was issued, the Eleventh Circuit has applied the *Mt. Healthy* test, and the Court sees no reason to depart from this precedent. *See Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008) (applying the *Mt. Healthy* burden-shifting formula to determine whether protected conduct is a motivating factor). The Court does not revisit its analysis under *Mt. Healthy*, and as the Court previously stated, conducting the burden-shifting analysis on a motion directed to the pleadings is premature, particularly as factual issues remain regarding the full timeline of events. (*See* Mar. 3 Order 21).

The City also challenges causation in terms of the sequence of events, explaining its enforcement efforts predated Eisenberg's free expression and the time between the protected speech and the City's allegedly retaliatory conduct is too attenuated. (*See* Mot. 12–13). To establish a causal connection, a plaintiff must demonstrate his or her protected conduct was a motivating factor behind the alleged retaliatory misconduct. *See Bennett v. Hendrix*, 423 F.3d

1247, 1250 (11th Cir. 2005). "[A] plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Thampi v. Manatee Cnty. Bd. of Com'rs*, 384 F. App'x 983, 990 (11th Cir. 2010) (alteration added) (quoting *Shannon v. BellSouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)). In a similar vein, "[c]lose proximity in time between the protected activity and the adverse . . . action 'is insufficient to create a genuine issue of fact as to causal connection when there is unrebutted evidence that the decision-maker did not have knowledge that the [plaintiff] engaged in protected conduct.'" *Id.* (alterations added) (quoting *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)).

The parties have submitted voluminous records in support of their competing positions, most of which date from 2010 to 2013. (*See generally* Exs. [ECF Nos. 17, 51, 53, 61]). Missing are public documents predating 2010 that establish the timeline of events regarding Plaintiffs' protected activities and the City's enforcement efforts.[8] The motivation analysis — requiring an examination of what the decision-makers knew regarding the protected conduct — is not appropriate on a motion for judgment on the pleadings. (*See* Mar. 3 Order 21 (collecting cases)). And as Plaintiffs note, it is the City's pattern of conduct that should be considered in assessing a causal relationship rather than individual events. (*See* Resp. 11).[9] As previously stated, a retaliatory motive can be inferred from the City's alleged misconduct, which took place between

---

[8] The few filings predating 2010 are a 1988 Warranty Deed and Certificate of Occupancy [ECF No. 51-14]; a Code Compliance Violation [ECF No. 61-4] from August 2007 regarding a sanitation and debris violation that was resolved; an October 2007 Report of Fire Violations issued by Fire Department Inspector Machen at the time (*see* MTD App., Exs. 1, 7 at 4 [ECF Nos. 17-1 & 17-7]); a December 2008 change of occupancy/work permit application for the Sadigo [ECF No. 51-16]; and the Sadigo's 1999 Florida Hotel License Application [ECF No. 51-3].

[9] For example, the alleged retaliatory act by the City related to the Sadigo's financing presents questions of fact; the extent and timeline of the mortgagee's knowledge regarding the Sadigo' alleged hotel violations and its reasons for not renewing the loan are disputed. (*See* Mot. 13 n.6; Resp. 12 n.15).

2006 and 2012 and includes a events in close proximity. (*See* Mar. 3 Order 22–23).

### C. Due Process

In Counts III and IV, Plaintiffs allege federal and state law due process claims. (*See* Compl. ¶¶ 79–94). The City argues Plaintiffs' substantive due process claims fail on multiple grounds because Plaintiffs' property interest in the Sadigo is not an implied fundamental right, the City's allegedly improper actions are not legislative in nature, and the City possesses a rational basis for enforcing the Fire Code. (*See* Mot. 15–16; Reply 9). For support, the City cites *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994), a case in which a public employee terminated for allegedly pretextual reasons was permitted to raise only a procedural due process claim. *See id.*

The City's reliance on *McKinney* is new; the argument was not raised when the City moved to dismiss Plaintiffs' Complaint. In that briefing, the City did not contest whether "Plaintiffs have a constitutionally protected property and business interest in the Sadigo." (Mar. 3, 2014 Order 24). The Court previously found it plausible the City's actions were undertaken with an improper motive and were an abuse of discretion. (*See id.* 25). The City essentially requests the Court reconsider its earlier decision in light of *McKinney*, as well as additional arguments regarding a rational basis analysis. (*See* Mot. 15–17). Relying on *McKinney*, the City challenges whether the protection Plaintiffs seek can be based on substantive due process claims.[10] (*See id.* 15–16).

To state a claim for a violation of substantive due process under 42 U.S.C. section 1983, a plaintiff must allege "a deprivation of a constitutionally protected interest" resulting from "an abuse of governmental power sufficient to raise an ordinary tort to the stature of a constitutional

---

[10] Plaintiffs previously clarified they are not raising procedural due process claims. (*See* Mar. 3, 2014 Order 23).

15

violation." *Executive 100, Inc. v. Martin Cnty.*, 922 F.2d 1536, 1541 (11th Cir. 1991) (citation omitted). "'[C]onduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience shocking in a constitutional sense.'" *Maddox v. Stephens*, 727 F.3d 1109, 1119 (11th Cir. 2013) (alteration added) (quoting *Waddell v. Hendry Cnty. Sheriff's Office*, 329 F.3d 1300, 1305 (11th Cir. 2003)).

In *McKinney*, a county building official sued his supervisors and members of the board of county commissioners alleging he was pretextually terminated, resulting in a violation of his "constitutional employment rights" and denial of substantive due process. 20 F.3d at 1555. At issue was "whether, under the Fourteenth Amendment, a government employee possessing a state-created property interest in his employment states a substantive due process claim, rather than a procedural due process claim, when he alleges that he was deprived of that employment interest by an arbitrary and capricious non-legislative government action." *Id.* at 1553. The Eleventh Circuit in *McKinney* explained the "substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'" *Id.* at 1556 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)) (explaining most of the rights in the Bill of Rights are fundamental).[11] Rights "created only by state law (as is the case with tort law and employment law) are not subject to substantive due process protection under the Due Process Clause because 'substantive due process rights are created only by the Constitution.'" *Id.* (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (Powell, J., concurring))). *McKinney* held "in non-legislative cases, only

---

[11] Property interests "'are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law — rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1333 (11th Cir. 2004) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

procedural due process claims are available to pretextually terminated employees." *Id.* at 1560. Courts have extended *McKinney* to non-legislative, zoning and land use cases to preclude claims of substantive due process violations.[12] *See City of Pompano Beach v. Yardarm Restaurant, Inc.*, 834 So. 2d 861, 870 (Fla. 4th DCA 2002) (finding "developer had no cognizable substantive due process claim because its property interest in the building permits was created by state law, not the Constitution, and both the issuance and revocation of the building permits constituted executive and not legislative acts").

Plaintiffs argue *McKinney* is inapplicable because this case involves liberty as well as property interests. (*See* Resp. 16). Plaintiffs allege "property rights and liberty interests in their real property, their rights to use their real property for renting apartment units . . . and . . . engag[ing] in the business of renting apartment units . . . ."[13] (Compl. ¶ 81 (alterations added); *see id.* ¶ 89). In addition to having property interests,[14] Plaintiffs allege they engaged in protected First Amendment activity. (*See id.*; Compl. ¶¶ 36–43, 57, 60). Plaintiffs' activities — petitioning the City and publicly commenting on disputes with the City over the Sadigo (*see id.* ¶

---

[12] This case does not specifically concern zoning or land use permits. (*See* Mar. 3, 2014 Order 30 n.15).

[13] Counts III and IV incorporate allegations regarding the deprivation of Plaintiffs' liberty interest.

[14] The March 3 Order states:

> Plaintiffs were denied their constitutionally protected right to utilize their property and engage in a legitimate rental business at the Sadigo. (*See* . . . Compl. ¶¶ 22–25, 35–45, 81–86). Plaintiffs allege they had to refinance the Sadigo at enormous additional cost after the mortgagee decided not to renew the loan upon being informed the Sadigo was operating illegally as a hotel. (*See* [*id.*] ¶ 37). Plaintiffs also lost the Art Basel Foundation as a business client after the City informed the Foundation the Sadigo was operating illegally. (*See id.* ¶ 39).

(*Id.* 24 (alterations added)). Plaintiffs allegedly suffered diminution in value, injury to the Sadigo's business reputation and good will, and interference with operating a legitimate business, resulting from the City's repeated cease and desist orders, targeting of the Sadigo's clients, and two forced shutdowns of the Sadigo.

73) — constitute constitutionally protected speech. (*See* Mar. 3 Order 19).

The City asserts Plaintiffs' substantive due process claim is subsumed by Count II, alleging First Amendment retaliation. (*See* Reply 9 (citing *Dingle v. Coleman*, No. 5:10–cv–53–Oc–10GRJ, 2010 WL 4366886, at *2 n.3 (M.D. Fla. Oct. 28, 2010))). This is true. Notwithstanding the described deprivations of liberty and property interests, Plaintiffs' substantive due process claims essentially rely on the same allegations supporting the First Amendment retaliation claim of Count II. The substantive due process claims are thus subsumed by the First Amendment claim because a "'substantive due process right to free speech is duplicative of [a] First Amendment retaliation claim.'" *Lozman v. City of Riviera Beach*, No. 08–CIV–80134, 2014 WL 4101514, at *15 (S.D. Fla. Aug. 19, 2014) (quoting *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 900 (6th Cir. 2001)).

To the extent Plaintiffs' substantive due process claim is based on a First Amendment violation it fails because "'a cause of action cannot be based in substantive due process where a more specific constitutional provision is applicable.'" *Id.* (quoting *Brandenburg*, 253 F.3d at 900); *see also Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 547 (6th Cir. 2012) (explaining Supreme Court case law "precludes reliance on substantive due process standards when evaluating claims covered by explicit constitutional protections" because "when a specific amendment 'provides an explicit textual source of constitutional protection . . . that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" (alterations added and in original; internal citations omitted)). Consequently, the Court examines Plaintiffs' due process claim based solely on the deprivations of property alleged.[15]

---

[15] In this respect, the Court departs from its analysis in the March 3 Order on the City's Motion to Dismiss.

In determining whether a deprivation of a state-created right constitutes a substantive due process violation rather than a procedural one, *McKinney* and its progeny distinguish between deprivations resulting from legislative acts and executive acts. *See McKinney*, 20 F.3d at 1557 n.9. A substantive due process claim is not cognizable where it only involves a non-legislative or executive deprivation of a state-created right. *See DeKalb Stone, Inc. v. County of DeKalb, Ga.*, 106 F.3d 956, 960 (11th Cir. 1997) (explaining deprivations by executive act of state-created rights, such as public education and land use, are "protected only by the guarantee of procedural due process" (citation omitted)) (collecting cases). "Executive acts characteristically apply to a limited number of persons (and often to only one person); executive acts typically arise from the ministerial or administrative activities of members of the executive branch . . . . Legislative acts, on the other hand, generally apply to a larger segment of—if not all of—society." *McKinney*, 20 F.3d at 1557 n.9.

Plaintiffs do not challenge rulemaking or the enactment of City rules or regulations, but rather the City's enforcement of the City Code as applied to the Sadigo, including Plaintiffs' eligibility for a discretionary exemption to the Fire Code given the Sadigo's historic status. The City's enforcement actions are specific to Plaintiffs and the Sadigo and clearly do not affect the general population. Based on these alleged facts, Plaintiffs' substantive due process claims fail. *See id.*; *DeKalb Stone, Inc.*, 106 F.3d at 960 ("Where a property owner alleged that town executives arbitrarily and capriciously refused to issue a certificate of occupancy — another variety of state-created land use right — we held that no substantive due process claim had been stated." (citing *Boatman v. Town of Oakland*, 76 F.3d 341, 346 (11th Cir. 1996) (other citation omitted)); *Reserve, Ltd. v. Town of Longboat Key*, 933 F. Supp. 1040, 1044 (M.D. Fla. 1996) (finding plaintiffs did not possess a cognizable substantive due process claim for their state-created property interest in a revoked building permit where "both the issuance and revocation of

the building permit constitute 'executive' and not 'legislative' acts." (citation and footnote call number omitted)); *cf. Lewis v. Brown*, 409 F.3d 1271, 1274 (11th Cir. 2005) ("[F]or the purposes of substantive due process analysis, '[] enforcement of existing zoning regulations is an executive, not legislative act. . . . Acts of zoning enforcement rather than rulemaking are not legislative.'" (alterations added) (quoting *DeKalb Stone, Inc.*, 106 F.3d at 959)). Accordingly, Plaintiffs' substantive due process claims for constitutional deprivations of their liberty and/or property interests do not survive the City's Motion.[16]

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant, the City of Miami Beach's Motion for Judgment on the Pleadings **[ECF No. 52]** is **GRANTED** in part and **DENIED** in part. The Motion is granted as to Counts III and IV of Plaintiffs' Complaint and denied as to Count II.

**DONE AND ORDERED** in Miami, Florida this 19th day of September, 2014.

*[signature: Cecilia M. Altonaga]*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:  counsel of record

---

[16] *McKinney* does not prevent a plaintiff from maintaining a First Amendment retaliation claim even if the plaintiff lacks a protectable property interest or other state-created right. *See Beckwith v. City of Daytona Beach Shores, Fla.*, 58 F.3d 1554, 1562 (11th Cir. 1995).